Case numbers 15-2041 and 16-1163, United States of America v. Kevin Price, oral argument not to exceed 15 minutes. First side for case number 15-2041 and 16-1163 to be submitted on the briefs. Mr. Jeffrey Paul Nunnery for the appellant, you may proceed. Thank you. May it please the court. My name is Jeffrey Nunnery. I'm here on behalf of the appellant, Kevin Price. I would like to reserve five minutes for rebuttal. Before I begin, I would like to briefly note the recent passing of District Court Judge David Katz out of the Northern District from where I hail. He was a very good man and a very good judge. He will be missed. He was a very good man. Yes, he was. It is our position that the District Court erred by misapplying or not applying properly the holding, fairly recent holding of the United States Supreme Court in Bailey v. United States. As the court is aware, Mr. Price was apprehended prior to a search warrant being executed at his premises. There were three police vehicles basically staking out Mr. Price's residence. One just beyond his driveway, one guarding an alley that ran behind the residence, and one just up the street north and around the corner to the west. The officers were assembling, getting ready to execute the warrant. The weather was very bad. The roads were snowbound. The traffic was limited by the snow. You admit, if they caught him right there in front of the premises, it would be okay? I wouldn't be standing here. So how close would they have to be, like literally on the property? I would say at least within the curtilage, as I read Bailey. The original plan, I guess, was the driveway. That would have been okay. That would have been fine, but things didn't quite work out that way. He's moving the other way, though. On the street, it wouldn't be in the curtilage, would it? No, the street would not be within the curtilage. If he was parked on the street, that's too far. It's under Bailey. Right. And the apprehension took place much further away than that, Your Honor. Yes, about a block away. A block north of the residence. Mr. Price, they didn't know it was him at the time. A vehicle matching a description of one of his vehicles drove southbound on Fuller Street, which was the street where his residence was located, around the block. Came up and parked on Fisk, which is the next street north of his residence. Parked sort of haphazardly. Still unidentified, he approached a vehicle that was described as a Tahoe, running with a black male driver. Mr. Price went to the vehicle, had brief exchange with the driver, I guess leaned his upper body into the vehicle very briefly, came back out. One of the officers, I think it was Officer Frederick, who was on Fisk, observed the activity and said, hey, I think I might have seen a drug deal. The Suburban pulled off, or the Tahoe pulled off, and there was some discussion, perhaps, should they pursue the vehicle? Decided no, we don't have enough manpower. The individual then was observed walking eastbound on Fisk and turned southbound down the alley behind the residences, serves the residences on Fuller. And then I guess was briefly observed going back and forth, going from the house to another vehicle. He entered that vehicle, drove northbound through the alley, and he was not positively identified as being Mr. Price until he made the turn westbound onto Fisk. Let me ask you a question about part of what you said there. You have a pretty tough standard of review here. We have to take the facts and the light most favorable to the district court's decision. Does that mean, would you concede, that we have to take as a fact here that when he puts his head in the window of the Tahoe, that there is good reason to think that they're engaging in some kind of hand-to-hand drug transaction? It could have been that. It could have been something innocent, but you don't have to take into account the innocent conduct. The officers are entitled to rely upon their observations. At best, they had reasonable suspicion. Why wouldn't that be probable cause, or at least something that gets you marching towards probable cause? It might get you marching toward probable cause, but it doesn't get you there. What about when you take into account— I mean, they had enough information to obtain the search warrant for the residence, and they had some information that connected Mr. Price to the residence, and they had some information that connected Mr. Price to prior drug activity, and they knew Mr. Price, didn't they, or somebody did. One of the officers knew Mr. Price, recognized him. Not until he had already left his residence. But the question that Judge Kethledge raises goes to whether you can just forget about Bailey, and whether this case should be resolved based on whether the officers had probable cause to arrest Mr. Price at the time he was arrested. Am I correctly interpreting? Bailey really doesn't necessarily have anything to do with the case. What I'm asking you about goes to the question that I think Judge Kethledge initially raised, which is did they have probable cause to arrest him at the time he was arrested without regard to Bailey and his location? I'm going to say no. They did not have probable cause. Well, I mean, you probably need to say no. I'll say no. No is probably your preferred answer. And I'm going to stick to it. Well, I mean, and I genuinely want to hear the reasons why you think that. And let me just sort of lay out the constellation of facts a little bit and let you respond to it. So, you know, and again, I mean, the standard of review, you know, it's tough for you. You have a headwind there. But we have a suspected hand-to-hand drug transaction inside of the officers. We have the facts in the affidavit giving rise to the warrant. Those are not, I mean, they're on the light side. Well, okay. I thought they were a bit on the light side, frankly. But that's fine. I mean, in terms of just how much it adds to this question. Then isn't it fair to say that you have what looks like evasion or flight? You know, he parks the trailer in a way that blocks. And, I mean, I think Judge Yonker was very skeptical that he didn't notice a blue unmarked Crown Vic and, you know, two other police-type vehicles sitting around his house that he walks right by. So you have potentially flight plus watching the hand-to-hand transaction plus the stuff that brought him there in the first place. Why isn't that probable cause? I think if you add the element of flight, you're there. Really? And in my supplemental authorities I filed yesterday, indicated as much. Well, so that would be based on the permissibility of an inference that he was aware of the presence of police officers and that his conduct could properly be interpreted as flight. Okay. So is that right? If he's aware of the presence of the police officers, why in the heck is he engaging in what appears to be a drug deal session? That's a great question. So you think the inference is not permissible? No. It's a great question. You can't have it both ways. Right. No, that's an excellent point. The one thing I will say, in having done this for a little while now, is criminals do a lot of foolish things. Oh, yes, they do. I had a case when I was a clerk where these guys got pulled over with 1,000 pounds of cocaine in the car and they got caught just because they're going 85 in a 55. Oh, yeah. So, I mean, your point is a very important one. It's just not – I don't know. It's a hard case. It's a hard case, but I don't think it's that hard when you take into account all they really had was reasonable suspicion unless you interpret it. They could have had a Terry stop. That's okay. A Terry stop would have been okay. But they didn't do a Terry stop. Well, it's not. It was a slow motion Terry stop. Oh, yeah. Well, if it was a Terry stop, then it's okay, right? Yeah. Are you saying that? I would think that a Terry stop, after witnessing what appeared to be a hand-in-hand drug transaction, would have been perfectly reasonable. But that's not what – They did stop him. I'm sorry? They did stop him within the block. A Terry stop doesn't require you to stop him right on the point, does it? Well, they stopped him around the block after a cruiser had headed him off and came head-to-head with his vehicle. Another came up behind. They had him boxed in. Everybody came out, guns drawn, on the ground, you know, coughed, stuffed, and taken back to the residence. So that would go – that, according to you, makes it clear that what happened was not a Terry stop. Not a Terry stop. But it was an arrest from the get-go. It was a custodial, a full-blown custodial arrest once they got him out of the vehicle, on the ground, cuffed him, and stuffed him. What was admitted in the case that you're trying to suppress? Well, some guns. Out of the storage place? Out of a van. The van he was driving, right? No. A van remotely located from the residence. A van to the search of which he consented. Well, if you want to call it that. You say the consent is tainted. It's tainted. It was tainted. And it's something that this court has held repeatedly in the past, that voluntary consent after an illegal arrest, unless you can attenuate it somehow, the evidence has to be suppressed. Did the officers find anything in the house that linked up to that van? No. No storage? No. The receipts that they found for the storage unit were found in the truck that Mr. Price was first driving that he left parked haphazardly on Fisk Street. So if Price – so they're there at the residence. They want to execute the search warrant. Let's say Price never comes home. They execute the residence. They don't even find. They don't even get to the storage units. Once they search the vehicle, which was well off of the premises, by the way, up on Fisk Street, it wasn't until they searched that that they came across these receipts for the storage unit. They're like, well, maybe we better go there because we're not finding what we're looking for here. Was the vehicle on the premises when they first saw it? No. Never was? No. No, never was on the premises. Was it in an alley or somewhere? It was parked on Fisk. He drove it southbound past the residence on Fuller, around the block, up the back. I think this is how it happened. But he ended up parked eastbound on Fisk. How close to the house was it? At its closest point? Well, I think the residence is one or two lots south of Fisk on the east side, and where he was stopped – your question was where was he stopped? Or where was the vehicle? Where was this truck at the closest time? If it was on the premises when they first saw it, they could have searched it, right? Yes, but it was not there. It was parked on Fisk just west of Fuller. So it's a good distance, 400, 500, 600 feet, I don't know, off the premises. You'll have your rebuttal. Thank you. Good morning, Your Honor. Sally Behrens on behalf of the United States. May it please the Court, given where the Court has gone, I'd like to just start with probable cause. I think that makes the most sense. I actually think that probable cause is apparent from the search warrant affidavit. I know Judge Kethledge has just said it's a little light. I mean, I'll have to go back and look at it again. Basically what the search warrant affidavit says is that in January, so a few weeks before, a couple weeks before the search warrant was executed, the police arrested a man named Larry Vaughn, and Mr. Vaughn admitted to distributing heroin, and he revealed that he got his supply from Kevin Price. He gave a description of Mr. Price, and he said he told the officers where Mr. Price lived and provided vehicle information. Mr. Vaughn advised that- Did the vehicle information match the vehicle Mr. Price was, in fact, driving? It matched vehicles that were on the location. The officers definitely corroborated the vehicle information. I don't know from the warrant, I don't think, whether or not both of the vehicles that were on the premises at the time were the same ones that were described in the warrant. There was a vehicle with a plow, and I just can't remember from the record off the top of my head whether or not it's the same. But what Mr. Vaughn advised was that he had been purchasing heroin from Mr. Price since May of 2013, so a little under a year, and that he purchases between 5 and 10 grams of heroin at a time, so approximately every 10 to 14 days. So Mr. Vaughn told police that Mr. Price had committed a crime. Based solely on Mr. Vaughn's statements, the officers had PC to arrest Mr. Price. Well, I guess the one thing that I recall that was a little light on perhaps was any information about the reliability of this informant. The informant was named, so that's helpful, of course, to the government. In addition, two of the detectives drove Mr. Vaughn past Mr. Price's house and he pointed out the house in the pickup truck, and the officers also did additional surveillance and observed Mr. Price walking out the front door of the address so they could at least link Mr. Price to the address. It would be one thing if they saw a bunch of traffic coming back and forth through the door. I mean, the man walks out of his house. I don't think that's probable cause relevant. There's also a report in the search warrant from another detective who stated that she also had received a tip about Mr. Price sometime previous, so that adds to probable cause. Then the officers surveilled the residence in advance of the search warrant and see what appears to be a hand-to-hand transaction. I mean, what about Mr. Nunnery's point that, you know, why in the world does, I mean, if he knows that all these police cars are around his house, why is he doing a hand-to-hand deal? The hand-to-hand transaction happens pretty early in the surveillance. I mean, it happens almost immediately after the officers initially arrive, so it may be that he didn't see them right away and then realized what was going on and left the vehicle. I thought one of the officers said he walks right by their vehicle on his way to do this thing. I think that's true. I don't know which vehicle it was and whether, again, whether he noticed it right away or noticed it later, but he left a truck in the middle of the road. And that is a certain incoherency. Now, whether it's an incoherency in Mr. Price's thinking or in the officer's story, who knows, but that's— Or there may be an innocent explanation that he simply hadn't figured it out yet, and when he did, he decided, I'm going to leave the one truck in the road and go get the other one behind the house. A vehicle that was most obvious is the unmarked Crown Vic, right? And so we don't know whether that's the vehicle that he— I think it was. I think it was the vehicle that he walked by. But then, you know, if he sees, again, another car staking out the alleyway and it, you know, starts to add up, I think people realize once they see a couple of cars with tinted windows. And Judge Yonker also took that inference from the evidence before him. In addition, we shouldn't lose sight of the fact that Mr. Price did have six drug convictions and the officers were aware of that. They're certainly allowed to rely on that as part of their inference. What does the law say about whether that's probably, you know, in dish of, like, you know, current criminal activity? Does—I forget. I'm just— Can we take that into account? I mean, it would be—404 would be evidence at trial, probably, and— But is that evidence that favors probable cause? Is there a case that says that? I don't have that at the tip of my tongue, but that has always been my understanding of the law. We can submit a 28-day— No, that's okay. I mean, this is—we can chase that. It's not too complicated. But I do believe that the— although Judge Kethledge seems a little bit skeptical of it, I do believe that where you have an individual who has reported a crime, who was an eyewitness to a crime, whether or not he has demonstrated beyond a reasonable doubt that a crime exists, I certainly think that there's probable cause, and the magistrate found probable cause to search the House based on this warrant. Is there—I'm sorry, go ahead. So the contents of the warrant, the observations of Mr. Price on the scene, both what may have been the drug transaction and what may have been or not have been the flight, or at least the—I mean, it's obviously not quite a full-speed run or departure, but it's something. The fact that he didn't park at the house to begin with, I mean, would that be something? The fact that he didn't— He didn't park at the house to begin with. Right. I mean, and— Yes, before he left the premises. I think all of those are more than sufficient to demonstrate probable cause to me. Is there anything else? Have we got the full picture? I think you have the full picture. Okay. How far away was this? Until, of course, they get into the house. Now, I could argue to you, even if they only had reasonable suspicion to do the initial stop, once they get into the house and continue to develop additional evidence of drug dealing, which certainly was in the house, then you could add the contents of the house to the probable cause. That would be after the fact. After they arrested him, they got probable cause. This, of course, assumes that it was an arrest at the beginning. It looked like one. And this court has had a spectrum of cases between Houston and Lopez Arias, and this case falls on that spectrum somewhere. I'm not going to argue too hard that it's a Terry stop and not a de facto arrest, but— Now, wait a minute. I thought probable cause was determined based on information at the time of the arrest. Where do we get this after the fact? No, I'm sorry. You're absolutely right. My point is simply that if you called the initial detention of Mr. Price a detention and not an arrest, which the panel doesn't— It's an encounter. Oh, so we would have to— It's essentially a Terry stop. The first stop in this analysis would be saying that what looks like an arrest is not an arrest, and therefore we get to take some more information into account. I would point the court to its decision in Jacob. This might not be your best argument, in my view. I will have a— I was following along a lot more easily at an earlier point. I will say that in this court's decision in Jacob, taking someone out of a car at gunpoint and handcuffing them and putting them in the back of a police cruiser is not always considered an arrest. It sometimes is considered— Yeah. Three hours later, it might be. But I'll stop arguing about it. I'm sorry. Is there a case or two that you could direct us to that would support your argument that based on these various facts there was probable cause here? I don't know that I— Again, I don't know that I have a specific case that is exactly on point with this one, but we'd be happy to look into that. No, that's all right. All right. I don't also want to give up on Bailey entirely. I think that it's an interesting question whether or not someone who is on the premises and whom officers see on the premises who then— See them on the premises. They saw them in the vicinity. Well, that's different. I mean, you know, that matters. Immediate vicinity, I guess, is what Bailey says. They had prior information as expressed in the warrant, an affidavit supporting the warrant, that he was connected with those premises. That's absolutely right. But that's what you've got to go on. And Bailey does say that the officers consider whether he's in the line of sight of the premises. It is not simply on in the lawful boundaries in the person. Your Honor says it's the curtilage. Does Bailey say curtilage or no? I don't think Bailey says curtilage. It does say whether or not it was— The court should consider whether or not the person was within the lawful limits of the premises, whether the occupant was within the line of sight of his dwellings, and the ease of the reentry from the occupant's location and other relevant factors. You know, my interest in the— I don't know. I mean, I don't speak for my fellow panelists on this, but my interest in whether there was probable cause at the time of whatever it was is that I don't know why Bailey should— I don't know why the law should be that it matters how quickly they apprehended him, but it's certainly messy to try to deal with Bailey in the context of this case. I agree. And the government's primary concern, I think, on the Bailey issue is that it would be an unfortunate turn of the law if someone who was on the premises were able to escape detention because of Bailey if they just run fast, if you're able to get away quickly from the premises and are no longer detained. Well, that's a different case, though. Somebody who starts on the premises where a search is ongoing and then flees, the officers don't know if that person has evidence. I mean, that presents questions about the integrity of the search that this guy on these facts doesn't. I mean, you know, there's all this conversation about immediate vicinity and, you know, one block, 500 feet, whatever. It's like, what is the reason for this rule? The reason seems to be we don't want people running off with evidence and we don't want people that are in this tight zone to be doing things that are dangerous to the officers. Is that fair? That's fair, except that I would also add, although Bailey discounts it a little bit, that we don't want people to leave the scene, get help, and go back. Right, absolutely. And that is a concern in this case, primarily. I mean, you have Bailey who, I mean, sorry. What did Bailey say on this point exactly? Bailey said that unexpected arrivals are always a concern, and I think that's right. However, there's a heightened risk in a case like this one where the target of the investigation may be fully aware of what's going on, which was not the case in Bailey. In Bailey, there was no evidence that they walked by the cops coming up to the door, didn't they, in Bailey? In Bailey, the officers didn't even know whether or not for sure he was actually associated with the residence to be searched. The guys they arrested, they passed each other coming in and out of the house is my recollection. I don't, on foot? I don't believe it was on foot. He just saw him, and they may have seen them in the car as they left. I guess, I mean, on the Bailey issue, can you cite for us any case in which a court held that pursuit of somebody who was off the property, beyond the curtilage, pursuing a person, moving away, was permissible under Summers, and where the court didn't get reversed for that whole thing? No, I can't. I mean, it just seems like you cannot pursue the guy. Absent some manifest danger to safety or something, if he is going the other way, I mean, you should kind of welcome that, apparently, you know, per the logic of these cases. I mean, we just take him as we come to him. The other way that I think that Bailey is distinguishable, just to make one more point on Bailey, and then I'll move on, is that Bailey does make a point of talking about the decision to arrest, or the decision of when to stop the person. In Bailey, the decision wasn't made until five minutes later, a mile away from the house. That's not the case here. Here, the officers attempted to detain Mr. Price on the spot and just didn't manage it because of the bad conditions of the road. And that is a distinction from Bailey, I think, that is important in this case. I should also then just move on briefly to the inevitable discovery argument, because what we have here is officers who are doing what they're supposed to do, they're executing a search warrant at a house, they find these additional receipts for storage units, they send an officer to go figure out what it is, they send another officer to go execute or to go get a search warrant. And this isn't like, say, Quinney, where the officers just have PC but don't bother to get a warrant. Here, they were on their way to do it, but for the defendant's interjection of, no, search it because I want you to take me to jail. I mean, that's what happened here. They wouldn't have had this information except upon seizure of the truck, would they? That's what your opponent says. If that's not correct, let me know. I believe that the invoices were found in the truck. The truck was covered by the warrant, though. Does it say truck or does it say what's on the premises? The warrant says vehicles associated with the subject as well. But they have to be on the premises. I mean, there's – It says all vehicles registered to or utilized by the subjects. But if there was a vehicle in Toledo and they found a piece of paper in searching his house and said, hey, actually, this guy has some vehicles registered to him in Ohio, they couldn't call and have somebody go search that vehicle. I mean, the particularity requirement, you have to say the place, right? Here, the vehicle is associated with the house. I mean, it's . . . Yeah, but probably the language of the warrant is a little loose on that point. I mean, you know . . . It's not being . . . It probably is intended to cover vehicles that are associated with the premises in some way as opposed to vehicles associated with the individual. Question whether it would be valid if it covered apparently unrelated vehicles, unrelated to the house, that is. I don't believe that we have a vehicle that's unrelated to the house in this case. In addition, I would just note that the vehicles PC discussion does talk about the vehicles that Mr. Price drives. I would have to go back and look to make sure that the vehicle that's discussed here is the same one that they found the receipts in. However . . . Is it described in particularity in the warrant? They don't have a license plate number of him, but they do talk about it being a pickup truck with a plow attachment parked up front. Is that what had the AK-47? No. I'm really getting confused with all these trucks. They had a lot of vehicles. What happens is they execute the search warrant at the house. They find these receipts for what has a storage unit on it. Somebody goes to that storage unit, which is far away. How far? I don't know. They were able to get there within a half hour probably, but not located with the premises. So the officer goes there, and they discover that the two storage units are actually a mailbox and a parking spot. The parking spot has a van on it, and the van has license plates that don't match the truck, don't match the van. But they look at the VIN number, and the VIN number indicates that it's owned by Mr. Price. So at that point, another officer is going to write up the search warrant to search the van. They go get the warrant. They go get the warrant. But they radio back to the house, and Mr. Price, who's been begging them to take him to jail at this point because he doesn't want to be labeled a snitch and all the neighbors are out on the porches watching and seeing what's going on, he says, just break a window and search it. You don't even have to wait for keys or a locksmith. Just break a window and search it. There's guns in that van. You can take me to jail. That's our inevitable discovery. That's very helpful. That's the unconsented to search. Right. It's inevitable because they were going to get a warrant. They were going to get a warrant. And this isn't a case where they had PC and they just didn't bother to get it or they said, well, I could have gotten it. No, they were on their way. But for his outburst of consent, they would have just gone further. Okay. Thank you. All right, Mr. Guthrie. I want to make it clear there was no warrant for that van. They were in the process of getting one, but they didn't get one. Would you agree that they had probable cause, you know, that they were entitled to one once? I would concede that, yeah. Yeah, all right. I mean, I don't think that necessarily says one thing or another. No. I appreciate it. And, you know, look, if they had probable cause to get an arrest warrant for Mr. Price before they even executed the search warrant, they could have gotten that warrant at the same time they got the search warrant. They didn't. All right. So there's no ‑‑ I mean, if they had the probable cause, then why in the heck wouldn't you just go ahead and get it? And the reason they might have had probable cause at the time he was detained, in all fairness, is because additional things happened. Well, they were going to take him down regardless. So they took him down, but they didn't do it in the immediate vicinity of the premises. Well, you know, I mean, maybe they were and maybe they weren't, but, I mean, we don't consider ‑‑ it's not a question of their subjective intent. Okay. Well, you know, my argument is if they had the probable cause, they should have gotten the warrant. They should have gotten the warrant for Mr. Price's arrest. They should have gotten the warrant for the van because the officers should have been on notice that their conduct in this case was getting perilously close to crossing the line given the Bailey decision. If you're going to be careful, if you're going to be prudent, then let's cross all your T's and dot your I's. They didn't do that, and they do so at their own peril. The prosecution says it's inevitable discovery. Why is that not in effect here? Well, and I want to cite this to this court's previous holding in Quinney. If that wasn't a case of them having enough information to go and get the warrant and if their conduct in that case was not sufficient to bring it within the ambit of the inevitable discovery doctrine, then this case isn't there either. Quinney had more powerful facts against the defendant than this case did. I want to get back. If Mr. Price had spotted the police, wouldn't the logical thing at that point for him to do would be to just leave the scene completely? That is the logical thing. Why go back? Well, I know. Let me ask you, if I may, just real quick on the inevitable discovery. If he does not give the tainted consent, what happens factually? Factually, on the basis of this record, what we had was the discovery of receipts in a truck, which may have been within the purview of the warrant, which was not on the premises. But they find the receipts, and they are in the process of getting a warrant, and I guess one could assume that they eventually would have got one, but I don't know. If we say, okay, they had probable cause, the warrant that they were on the way to get, they had probable cause, and we take out his tainted consent here, we take out the arrest or whatever you want to call it of him altogether, and it still seems to lead to getting a search warrant for the van that has the weapons, why isn't that inevitable discovery? Well, if you're going to take out facts, then you've got to take out the fact that the truck wouldn't have been there either, they wouldn't have found the receipts for the storage. Which truck? The one he was driving. Right. Yeah. So I just want to, you know. Let me ask you one quick question. There's just a lot of factual detail in this case. I mean, why, number one, why is he parking this truck and the trailer in the road, and why is he walking to another vehicle and then driving away? No idea. I mean, can we say that that adds to the suggestion of flight? No, I don't think so. Why? I mean, what the heck is he doing? What the heck is he doing selling drugs in front of the cops if they're there, if he knows that they're there? I mean, there's flight. I don't think you can say that it was flight unless he knows. He has to know what he's running from. The behavior becomes particularly odd when one thinks about the weather conditions. How so? Well, it just seems to me that if you were going to be running around to this extent outside your residence, given the weather conditions, you would have had to have had a reason that seems to you pretty good to do it, like engaging in a drug transaction. I go to the grocery store, and roads are awful. I mean, people travel during bad weather, and that's the problem with this case. You've got bad weather, bad roads. I'm from Tennessee. Okay, well, come up north. Bad weather, bad roads, and poor parking does not work to spatially expand the immediate vicinity test of Bailey. And the government, at page 31 on their brief, relies on the old Summers standard. They said the police acted as swiftly as practical to detain him for investigatory purposes. Well, it wasn't for investigatory purposes, and, yes, they may have acted as quickly as practical, but that was Michigan versus Summers, which was cabined by Bailey. Okay. I think you are at the end. We appreciate very much the arguments that both of you have given, and your engaging with the court and being totally on point, and that was . . . thank you. And, Mr. Nunnery, thank you especially for accepting this appointment under the Criminal Justice Act. You render a very important service to your client and to the court. Thank you both. I move the motion. Second. Thanks.